# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1081

_____

| | |
|---|---|
| MidAmerican Energy Company, | * |
| | * |
| Petitioner, | * |
| | * |
| Western Coal Traffic League, | * |
| | * |
| Intervenor on Appeal, | * |
| | * |
| v. | * |
| | *  Petition for Review of an Order |
| Surface Transportation Board; | *  of the Surface Transportation Board. |
| United States of America, | * |
| | * |
| Respondents, | * |
| | * |
| Norfolk Southern Railway Company; | * |
| Union Pacific Corporation; Southern | * |
| Pacific Transportation Company; | * |
| Consolidated Rail Corporation; | * |
| Association of American Railroads, | * |
| | * |
| Intervenors on Appeal. | * |

_____

No. 97-1284

_____

| | |
|---|---|
| Central Power & Light Company, | * |
| | * |
| Petitioner, | * |

|  |  |
|---|---|
|  | * |
| Western Coal Traffic League, | * |
|  | * |
| Intervenor on Appeal, | * |
|  | * |
| v. | * |
|  | * |
| Surface Transportation Board; | * |
| United States of America, | * |
|  | * |
| Respondents, | * |
|  | * |
| Norfolk Southern Railway Company; | * |
| Union Pacific Corporation; Southern | * |
| Pacific Transportation Company; | * |
| Consolidated Rail Corporation; | * |
| Association of American Railroads, | * |
|  | * |
| Intervenors on Appeal. | * |

_____

No. 97-1331
_____

|  |  |
|---|---|
| National Industrial Transportation | * |
| League, | * |
|  | * |
| Petitioner, | * |
|  | * |
| Western Coal Traffic League, | * |
|  | * |
| Intervenor on Appeal, | * |
|  | * |
| v. | * |
|  | * |
| Surface Transportation Board; | * |

-2-

United States of America,                    *
                                             *
            Respondents,                     *
                                             *
Pennsylvania Power & Light Company;          *
Norfolk Southern Railway Company;            *
Union Pacific Corporation; Southern          *
Pacific Transportation Company;              *
Consolidated Rail Corporation;               *
Association of American Railroads,           *
                                             *
            Intervenors on Appeal.           *


                    _____

                 No. 97-1332
                    _____


Union Pacific Railroad Company;              *
Southern Pacific Transportation              *
Company,                                     *
                                             *
            Petitioners,                     *
                                             *
        v.                                   *
                                             *
Surface Transportation Board;                *
United States of America,                    *
                                             *
            Respondents,                     *
                                             *
Pennsylvania Power & Light  Company;             *
Norfolk Southern Railway Company;            *
MidAmerican Energy Company;                  *
National Industrial Transportation           *
League; Union Pacific Corporation;           *
Consolidated Rail Corporation;               *


                        -3-

Association of American Railroads;    *
Western Coal Traffic League,          *
                                      *
        Intervenors on Appeal.        *

——————————

No. 97-1333

——————————

Consolidated Rail Corporation,        *
                                      *
        Petitioner,                   *
                                      *
    v.                                *
                                      *
Surface Transportation Board;         *
United States of America,             *
                                      *
        Respondents,                  *
                                      *
Pennsylvania Power & Light Company;   *
Norfolk Southern Railway Company;     *
National Industrial Transportation    *
League; Union Pacific Corporation;    *
Southern Pacific Transportation       *
Company; Association of American      *
Railroads; Western Coal Traffic League,   *
                                      *
        Intervenors on Appeal.        *

——————————

No. 97-1335

——————————

Association of American Railroads,    *

-4-

|                                                              |   |
|--------------------------------------------------------------|---|
| Petitioner,                                                  | * |
|                                                              | * |
| v.                                                           | * |
|                                                              | * |
| Surface Transportation Board;                                | * |
| United States of America,                                    | * |
|                                                              | * |
| Respondents,                                                 | * |
|                                                              | * |
| Pennsylvania Power & Light Company;                          | * |
| Norfolk Southern Railway Company;                            | * |
| National Industrial Transportation                           | * |
| League; CSX Transportation, Inc.;                            | * |
| Union Pacific Corporation; Southern                          | * |
| Pacific Transportation Company;                              | * |
| Consolidated Rail Corporation;                               | * |
| Western Coal Traffic League,                                 | * |
|                                                              | * |
| Intervenors on Appeal.                                       | * |

_____

No. 97-1583
_____

|                                    |   |
|------------------------------------|---|
| Western Coal Traffic League,       | * |
|                                    | * |
| Petitioner,                        | * |
|                                    | * |
| v.                                 | * |
|                                    | * |
| Surface Transportation Board;      | * |
| United States of America,          | * |
|                                    | * |
| Respondents,                       | * |
|                                    | * |
| Union Pacific Corporation; Southern| * |

Pacific Transportation Company;        *
Consolidated Rail Corporation;         *
Association of American Railroads,     *
                                       *
          Intervenors on Appeal.       *


_____

No. 97-2204
_____

Western Resources, Inc.,               *
                                       *
          Petitioner,                  *
                                       *
Western Coal Traffic League,           *
                                       *
          Intervenor on Appeal,        *
                                       *
     v.                                *
                                       *
Surface Transportation Board;          *
United States of America,              *
                                       *
          Respondents,                 *
                                       *
Consolidated Rail Corporation; Union   *
Pacific Railroad Company; Southern     *
Pacific Transportation Company;        *
Association of American Railroads;     *
Norfolk Southern Railway Company,      *
                                       *
          Intervenors on Appeal.       *


_____

No. 97-2206

-6-

_____

Association of American Railroads,    *
                                      *
Petitioner,                           *
                                      *
v.                                    *
                                      *
Surface Transportation Board;         *
United States of America,             *
                                      *
Respondents,                          *
                                      *
Pennsylvania Power & Light Company;   *
Norfolk Southern Railway Company;     *
Western Coal Traffic League; National *
Industrial Transportation League;     *
MidAmerican Energy Company;           *
Western Resources,                    *
                                      *
Intervenors on Appeal.                *

_____

No. 97-2260
_____

Consolidated Rail Corporation;        *
                                      *
Petitioner,                           *
                                      *
Association of American Railroads,    *
                                      *
Intervenor on Appeal,                 *
                                      *
v.                                    *
                                      *

-7-

Surface Transportation Board;    *
United States of America,    *
    *
      Respondents,    *
    *
Pennsylvania Power & Light Company;  *
Norfolk Southern Railway Company;   *
Western Coal Traffic League; National  *
Industrial Transportation League;   *
MidAmerican Energy Company,    *
    *
      Intervenors on Appeal.    *

_____

No. 97-2303

_____

Union Pacific Corporation; Southern  *
Pacific Transportation Company,    *
    *
      Petitioners,    *
    *
Association of American Railroads,   *
    *
      Intervenor on Appeal,    *
    *
    v.    *
    *
Surface Transportation Board;    *
United States of America    *
    *
      Respondents,    *
    *
Pennsylvania Power & Light Company;  *
Norfolk Southern Railway Company;   *
Western  Coal Traffic League;    *

National Industrial Transportation   *
League; MidAmerican Energy Company,*
                      *

      Intervenors on Appeal.   *

_____

No. 97-2328
_____

Western Coal Traffic League,   *
                      *
        Petitioner,     *
                      *
    v.                 *
                      *
Surface Transportation Board;   *
United States of America,   *
                      *
        Respondents,   *
                      *
Consolidated Rail Corporation;   *
Association of American Railroads;   *
Norfolk Southern Railway Company;   *
Union Pacific Railroad Company;   *
Southern Pacific Transportation   *
Company,               *
                      *
      Intervenors on Appeal.   *

_____

No. 97-2462
_____

National Industrial Transportation   *
League;                 *

-9-

|  | * |
| Petitioner, | * |
|  | * |
| Western Coal Traffic League, | * |
|  | * |
| Intervenor on Appeal, | * |
|  | * |
| v. | * |
|  | * |
| Surface Transportation Board; | * |
| United States of America, | * |
|  | * |
| Respondents, | * |
|  | * |
| Union Pacific Railroad Company; | * |
| Southern Pacific Transportation | * |
| Company; Association of American | * |
| Railroads; Consolidated Rail | * |
| Corporation, | * |
|  | * |
| Intervenors on Appeal. | * |

_____

No. 97-2464
_____

| MidAmerican Energy Company, | * |
|  | * |
| Petitioner, | * |
|  | * |
| Western  Coal Traffic League, | * |
|  | * |
| Intervenor on Appeal, | * |
|  | * |
| v. | * |
|  | * |

-10-

Surface Transportation Board;        *
United States of America,          *
                                *

           Respondents,        *

Union Pacific Railroad Company;  *
Southern Pacific Transportation    *
Company; Association of American  *
Railroads; Consolidated Rail      *
Corporation,                   *

         Intervenors on Appeal.   *
_____

Submitted:  November 18, 1997

Filed:   February 10, 1999
_____

Before WOLLMAN and HANSEN, Circuit Judges, and STEVENS,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

This is a consolidated action involving MidAmerican Energy Company (MidAmerican), Central Power & Light Company (CP&L), and Pennsylvania Power & Light Company (PP&L) (collectively the utilities). They petition for review of two orders of the Surface Transportation Board (the Board) dismissing their complaints against rail carriers. The carriers cross-appeal from the portion of the Board's decisions regarding reasonableness review of contractual shipping rates, arguing that

_____

[1]The HONORABLE JOSEPH E. STEVENS, United States District Judge for the Western District of Missouri, sitting by designation. Judge Stevens died on December 18, 1998. This opinion is consistent with the views he expressed at our post-argument conference.

the issue was not ripe for adjudication. We affirm the dismissal of the utilities' complaints. We dismiss the cross-appeal for lack of jurisdiction.

## I.

MidAmerican ships coal approximately 750 miles from the Powder River Basin in Wyoming to its generating facility near Sergeant Bluff, Iowa. At the time it filed its complaint, MidAmerican was shipping the coal from origin to destination under contract with the Union Pacific Railroad (UP). This contract was scheduled to expire at the end of 1997. Anticipating the contract's expiration, MidAmerican began to compare UP's rates with those of other carriers to obtain the most favorable shipping rates. The only other carrier offering rail service originating in the Powder River Basin is the Burlington Northern Railroad (BN).

BN does not service the final 90 miles of the route, a stretch from Council Bluffs, Iowa, to the generating station. Such a rail segment is commonly termed a "bottleneck," because it is serviced by only one carrier. Thus, MidAmerican could not directly compare the rates of BN and UP, as UP is the only carrier capable of shipping all the way to the generating station. To obtain a competitive rate for the 660-mile stretch from Wyoming to Council Bluffs, MidAmerican requested that UP provide a rate for its service over the bottleneck.

UP refused to provide the rate. Instead, it provided a rate for the entire route from the Powder River Basin to the generating station. This precluded MidAmerican from using BN as a carrier from Wyoming to Council Bluffs, essentially extending the bottleneck over the entire 750-mile route. Consequently, MidAmerican brought an action before the Board requesting a rate prescription over the 90-mile bottleneck segment. Although MidAmerican could not challenge a local "unit-train" rate for the

bottleneck service, it asked the Board to prescribe a reasonable rate for the bottleneck if it found the published "class" rate for the 90-mile stretch unreasonable.[2]

CP&L transports coal from the Powder River Basin in Wyoming to its Coleto Creek generating station in Texas. Although both BN and UP offer rail service originating at the coal mines, the Southern Pacific Railroad (SP) is the only carrier from an interchange point in Victoria, Texas, to Coleto Creek.[3] UP's lines run from Wyoming to Victoria; BN's lines run from Wyoming to Fort Worth, Texas, where SP's service to Victoria and Coleto Creek begins. Therefore, UP and BN directly compete on the portion of the route from Wyoming to Forth Worth. SP and UP directly compete on the portion from Fort Worth to Victoria. After both BN and UP indicated a willingness to offer competitive rates for their service, CP&L requested that SP provide it a local unit-train rate for the segment from Fort Worth to Coleto

_____

[2]A local unit-train rate is a published rate applicable to transport of a trainload of a specific good between two points on a carrier's line. A local class rate, on the other hand, is a published rate applicable to transport of a certain type of good in smaller quantities between two points on a carrier's line. Railroads must maintain class rates because of their common carrier obligation to transport goods to any point on their lines upon request by a shipper. See Thompson v. United States, 343 U.S. 549, 558 (1952); Westinghouse Elec. Corp. v. United States, 388 F. Supp. 1309, 1311 (W.D. Pa. 1975) (citing New York v. United States, 331 U.S. 284, 289-90 (1947)). Because it is more costly for carriers to offer service for unspecified quantities of goods, however, class rates are seldom used and are generally significantly higher over the same stretch of rail. See Routing Restrictions over Seatrain Lines, Inc., 296 I.C.C. 767, 773 (1955); Burlington Northern, Inc. v. United States, 555 F.2d 637, 639 (8th Cir. 1977) (noting that a class rate for coal shipment was more than double the unit-train rate).

[3]Based on stipulations entered into by the parties prior to the Board's hearing, we will disregard the fact that SP and UP have merged since the initiation of this action, resulting in UP's ability to offer unit-train service from Wyoming to Coleto Creek.

Creek, which represented SP's longest haul, or for the bottleneck from Victoria to Coleto Creek.

SP refused to provide either rate, offering instead to provide a joint rate with UP. CP&L chose to obtain a unit-train rate from UP for service from Wyoming to Victoria, and to ship from Victoria to Coleto Creek under SP's class rate.[4] It could thus take advantage of neither the competition between UP and BN from Wyoming to Fort Worth, nor the competition between SP and UP from Fort Worth to Victoria. Subsequently, CP&L brought a complaint before the Board challenging the class rate as unreasonable and requesting a rate prescription for the bottleneck segment.[5]

PP&L can transport its coal from either of two mines in central Appalachia to its four generating facilities on the eastern seaboard. One of the mines is serviced by the Norfolk Southern Railroad (NS), the other is serviced by CSX. Neither NS nor CSX offers service all the way to PP&L's generating stations. NS transfers its shipments to the Consolidated Rail Corporation (Conrail) at an interchange point in Hagerstown, Maryland; CSX transfers to Conrail in Lurgan, Pennsylvania. Conrail thus controls a bottleneck that services PP&L's four generating facilities. To obtain competitive rates for the portion of the route serviced by NS and CSX, PP&L

---

[4]SP's class rate for the coal shipment from Victoria to Coleto Creek was $19.95 per ton. At the Board's hearing, CP&L offered the testimony of eight expert witnesses that the highest reasonable rate for this stretch was $0.63 per ton, less than one-thirtieth of the actual class rate charged.

[5]Some shippers have eschewed the role of supplicant to the Board and have constructed connecting lines on their own. See Daniel Machalaba, Tired of Costs, Delays of Railroads, Firms Lay Their Own Tracks, Wall St. J., February 6, 1998, at A-1.

requested that Conrail provide it local unit-train rates from the interchange points to the generating stations.[6]

Conrail refused to provide such rates. Consequently, PP&L filed a complaint challenging Conrail's class rates from the interchange points to the stations and requesting that Conrail be required to provide local unit-train rates instead.[7] Conrail maintained that class rates were inappropriate for the route in question and asked the Interstate Commerce Commission (ICC)[8] for an opportunity to provide unit-train rates. The ICC ordered Conrail to do so in a decision dated January 17, 1995.

Rather than providing the rates, however, Conrail negotiated a joint rate for origin-to-destination service with CSX and a proportional rate for similar service with

---

[6]As is by now well known, subsequent to the submission of this case the Board approved the division of Conrail between NS and CSX. See Bruce Ingersoll, U.S. Approves Plan to Divide Conrail in Two, Wall St. J., June 9, 1998, at A-3 ("'This transaction, as conditioned, creates two strong competitors in the East that can handle the transportation needs of an expanding economy,' said [Board] Chairwoman Linda Morgan"). See also Norfolk Southern, CSX assume control of Conrail, Railroad NewsWire (Aug. 27, 1998) <http://www2.trains.com/trains/News/News.shtml>. What effect the NS's acquisition of Conrail's lines in Pennsylvania will have on PP&L's transportation needs remains to be seen.

[7]Although Conrail admits that PP&L sent test shipments from the interchange points to its generating stations prior to filing the complaint, it denies that such shipments were sent using a class rate.

[8]The ICC was subsequently replaced by the Board in the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (Dec. 29, 1995). The Termination Act also substituted the new Interstate Transportation Act for the earlier Interstate Commerce Act, both located at Subtitle IV of Title 49 of the United States Code. Pub. L. No. 104-88 §§ 102, 103, and 106. Although most of the provisions of the Interstate Commerce Act were re-enacted in the Interstate Transportation Act, the parties have relied, and we will base our decision, on the provisions of the old act because these cases were initiated before passage of the Termination Act.

NS. As a result, Conrail, rather than PP&L, took advantage of the competition between NS and CSX for service from the central Appalachian mines. PP&L then petitioned the Board for rate prescription on the bottleneck based on a renewed challenge to the class rates.

Although petitioners' cases involve distinct facts, they were consolidated by the Board for adjudication on common issues regarding "the extent to which bottleneck carriers may exert their market power over the routes and rates made available to shippers for needed rail service." Central Power & Light Co. v. Southern Pac. Transp. Co., No. 41242, 1996 STB LEXIS 358, at *8-*9 (Surface Transp. Bd. Dec. 27, 1996) (Bottleneck I). Before reaching its decision, the Board solicited commentary on bottleneck regulation from all potentially affected shipper and carrier organizations. After oral argument and consideration of the submitted materials, the Board denied the utilities' requests for bottleneck relief.[9]

In considering the utilities' requests, the Board grappled with the tension between two competing policies expressed in the Interstate Commerce Act (the Act). Under 49 U.S.C. § 10701a(a) (1995) (now 10701(c)), rail carriers possess broad discretion in setting rates and routes. This reflects Congress's goal of deregulating the railroad industry and allowing railroads to achieve revenue adequacy by competing on a free-market basis. See id. § 10101a(3) (now 10101(3)) (providing for adequate revenues); id. § 10101a(1) (now 10101(1)) (allowing "the demand for services" to dictate reasonable rail rates). Under sections 10101a(6) and 10701a(b)

---

[9]The complaints of MidAmerican and CP&L were dismissed in full; that portion of PP&L's complaint requesting rate prescription over the bottleneck segments was also dismissed. PP&L had amended its complaint to also challenge the joint and proportional rates with CSX and NS; the Board allowed this challenge to proceed, and the parties subsequently reached a settlement on that issue. We will thus address only the utilities' requests for rate prescription on the bottleneck segments in this appeal.

(now 10101(6) and 10701(d)), however, some rate regulation is required when carriers possess monopoly power over a section of rail. These provisions codify railroads' common carrier obligations, which require them to provide service at reasonable rates to all shippers upon request.

The Board resolved this tension in favor of the "rate freedom" of bottleneck carriers. Specifically, it held that bottleneck carriers satisfy their common carrier duties and thus comply with the Act by providing origin-to-destination service that includes the bottleneck, as in MidAmerican's case, or by providing joint or proportional service with other carriers that includes transportation over the bottleneck, as in CP&L's and PP&L's cases. In addition, the Board held that shippers may not challenge class rates as an "indirect basis for obtaining prescription of a local unit-train rate" for bottleneck segments. Subsequently, the utilities moved for clarification and reconsideration of the decision. The Board responded by issuing a second decision, granting in part the motion for clarification and denying the motion for reconsideration. See Central Power & Light Co. v. Southern Pac. Transp. Co., No. 41242, 1997 STB LEXIS 91, at *28 (Surface Transp. Bd. Apr. 28, 1997) (Bottleneck II). The utilities appeal from both rulings.

## II.

Before we address the specific issues raised in these cases, we briefly review the relevant history of railroad regulation. From its passage in 1887 until the mid-1970s, the Interstate Commerce Act provided for a strict regulatory framework to govern the federal railroad industry. This legislative approach resulted in an industry chronically plagued by capital shortfalls and service inefficiencies. See H.R. Rep. No. 96-1035, at 33 (1980), reprinted in 1980 U.S.C.C.A.N. 3978, 3978; Coal Exporters Ass'n of United States v. United States, 745 F.2d 76, 81 (D.C. Cir. 1984).

To assure railroads greater freedom in establishing routes and rates, Congress modified the Act with the Railroad Revitalization and Regulatory Reform Act (4R Act), Pub. L. No. 94-210, 90 Stat. 31 (1976), and the Staggers Rail Act (Staggers Act), Pub. L. No. 96-448, 94 Stat. 1895 (1980). See H.R. Conf. Rep. No. 96-1430, at 79 (1980), reprinted in 1980 U.S.C.C.A.N. 3978, 4110. These acts were intended to end "decades of ICC control over maximum rates and to permit carriers not having market dominance to set rates in response to their perception of market conditions." Midtec Paper Corp. v. United States, 857 F.2d 1487, 1506 (D.C. Cir. 1988).

Underlying these reform efforts was the notion that market forces would operate in the rail industry as they do in other spheres. Congress believed that free competition for rail services would ensure that consumer demand dictated the optimal rate level, while facilitating enough long-term capital investment to maintain adequate service. Congress was also mindful, however, that the free market would protect consumers only if there was "effective" competition. Therefore, the new enactments included provisions allowing regulatory intervention where competition would not control prices. See 4R Act § 101(b), 90 Stat. 31, 33; Staggers Act § 101(a), 49 U.S.C. § 10101a(6) (now 10101(6)); Coal Exporters, 745 F.2d at 81 n.6.

Indeed, in bottleneck situations the Staggers Act actually "increased the ICC's regulatory power -- by authorizing the agency to require railroads to enter into agreements to 'switch' other railroads' cars to and from shippers located along each other's lines . . . ." Baltimore Gas & Elec. Co. v. United States, 817 F.2d 108, 113 (D.C. Cir. 1987); see 49 U.S.C. § 11103 (now 11102). After the 4R and Staggers Acts, the agency (previously the ICC, now the Board) is still required to use rate prescription and other remedies such as reciprocal switching arrangements to ensure reasonable shipping rates on bottlenecks. It is also responsible for ensuring that free competition is preserved to the greatest extent possible on non-bottleneck segments.

Congress's decision to deregulate the railroad industry has been largely successful. Experts for both sides in these cases have acknowledged that competition has led to more efficient routes, increased profits, better service, and an enhanced ability to attract capital investment. See, e.g., Verified Statement of William J. Baumol & Robert D. Willig at 6-7, J.A. at 1111-12; Verified Statement of Alfred E. Kahn at 15-16, J.A. at 2931-32. However, the experts dispute the role of bottleneck rail segments in increasing profits and facilitating the overall revenue adequacy of the railroad industry.

## III.

We have jurisdiction under 28 U.S.C. §§ 2321 and 2341 (Supp. 1998), which provide for review of the Board's decisions. Because Congress has entrusted the Board with interpreting and administering the Act, in reviewing its decisions we ask only whether they are "'based on a permissible construction of the statute.'" Caddo Antoine & Little Missouri R.R. Co. v. United States, 95 F.3d 740, 746 (8th Cir. 1996) (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). Notwithstanding this narrow standard of review, we must thoroughly examine the record and inquire whether the Board correctly applied the proper legal standards. City of Cherokee v. ICC, 641 F.2d 1220, 1226-27 (8th Cir. 1981). We are obligated to overturn the Board's decisions if there are "compelling indications that the Board's interpretations were incorrect." GS Roofing Prods. Co. v. Surface Transp. Bd., 143 F.3d 387, 391 (8th Cir. 1998).

As the utilities and shipper organizations assert, carriers are bound both at common law and under the Act to "provide . . . transportation or service on reasonable request" to any shipper. GS Roofing, 143 F.3d at 391. This duty not only requires carriers to provide service on their lines, but also requires rates for such service to be reasonable. See Thompson, 343 U.S. at 554; 49 U.S.C. § 10701a(b) (now 10701(d)).

-19-

As the Board and the railroads assert, however, there are significant limitations to the common carrier duties. It is usually at the discretion of the carrier how it wishes to satisfy its duty to provide rates and service. See 49 U.S.C. § 10701a(a) (now 10701(c)). Consequently, a carrier may in most circumstances provide service in the form of a joint rate with another railroad, such as Conrail did with CSX in PP&L's case, or a proportional rate, as Conrail did with NS. See, e.g., Great Northern Ry. Co. v. Sullivan, 294 U.S. 458, 463 (1935) (holding that a shipper may not recover damages based upon the carrier's portion of a rate if the carrier chooses to offer only a joint rate with another carrier, unless the entire joint rate is unreasonable); Routing Restrictions, 296 I.C.C. at 774 (stating that nothing in the Act requires carriers to establish routes over all possible interchanges).

Further, a carrier generally may provide common carrier service in a manner that protects its "long hauls." See 49 U.S.C. § 10705(a) (now 10705(a)). The Board may order a carrier to provide service over a shorter haul than it wishes only if the Board first makes specific findings under the Act. See id. § 10705(a)(2). Thus, a carrier such as UP may normally choose to provide service to a shipper such as MidAmerican over a route longer than the 90 miles from Council Bluffs to Sergeant Bluff, unless the longer route would be "unreasonably long" or inefficient. See Thompson, 343 U.S. at 559-60 (holding that the ICC was required to make findings regarding the short-hauling exceptions before compelling a railroad to provide service over a shorter portion of rail than it wished).

Therefore, the Act protects both shippers and carriers. It guarantees that shippers will receive rail service at reasonable rates, and it allows carriers to provide such service in a manner that achieves revenue adequacy.

The Board has recognized that an important part of achieving revenue adequacy is differential pricing. See Consolidated Rail Corp. v. United States, 812 F.2d 1444, 1453-54 (3d Cir. 1987) (citing Coal Rate Guidelines, Nationwide, 1

I.C.C.2d 520 (1985)).  This is a practice by which carriers charge a higher mark-up on rail segments where demand elasticity is low, such as bottlenecks, to compensate for low mark-ups on competitive segments.  See Coal Rate Guidelines, 1 I.C.C.2d at 526-27.  Therefore, "services may be priced above their attributable costs according to observable market demand, but only to the extent necessary to cover total costs, including return on investment of an efficient carrier."  Id. at 533-34.  Accordingly, in reviewing the reasonableness of bottleneck rates, the Board allows bottleneck carriers to charge up to stand-alone cost (SAC), a level that is significantly higher than marginal cost.[10]  See id. at 526-29.

In the present case, the Board determined that exploiting bottlenecks by refusing to provide separately challengeable bottleneck rates also assists carriers in achieving revenue adequacy.  Specifically, in the MidAmerican case, allowing UP to provide only an origin-to-destination rate enables it to charge up to SAC over the entire 750-mile route, rather than just over the 90-mile section from Council Bluffs to Sergeant Bluff.  Were UP required to provide a separate bottleneck rate, it would be forced to charge lower competitive rates from the mine to Council Bluffs.  Similarly, in the CP&L and PP&L cases, allowing the bottleneck carriers to negotiate through rates and joint rates for origin-to-destination service enables them, rather than the shippers, to take advantage of the competition between non-bottleneck carriers.  After negotiating competitive rates for the non-bottleneck carriage, the bottleneck carriers will be able to charge the bottleneck shippers up to SAC for the entire route, rather than just over the bottleneck.  See Western Resources, Inc. v. Surface Transp.

---

[10]Stand-alone cost represents the minimum amount that a hypothetical carrier, or the shipper itself, would have to spend to build a new rail line to compete over the bottleneck segment.  See Coal Rate Guidelines, 1 I.C.C.2d at 528-29.  This measure better allows railroads to achieve true revenue adequacy, because it takes into account profits and the cost of long-term capital investment, while marginal cost does not. See id. at 526.

Bd., 109 F.3d 782, 787 (D.C. Cir. 1997) (describing the behavior of bottleneck carriers).

Based on these economic factors and extensive expert testimony, the Board concluded that the Act did not require carriers to provide separate bottleneck rates. Regardless of how we would resolve the tension in the Act if we were to independently rule on the utilities' claims, we cannot say that the Board's interpretation was incorrect. The Board's considerable expertise in the economic underpinnings of the railroad industry is entitled to a great degree of deference, and its decision to allow carriers to determine how they wish to fulfill their duties under the Act is consistent with the current national railroad policy of maximizing carrier discretion in setting routes and rates. Because the utilities have not demonstrated that the Board's rulings were incorrect, we affirm the Board's dismissal of the utilities' complaints.

We note that the Board's decisions explicitly provide the utilities three potential avenues of recourse. First, bottleneck shippers may obtain contracts for service over the competitive segments of rail. See Bottleneck I, 1996 STB LEXIS 358, at *30-*31; Bottleneck II, 1997 STB LEXIS 91, at *22. Once a contract is secured, the bottleneck carrier will be required to provide local service over the bottleneck in light of its common carrier obligations. Bottleneck II, at *22. Because such service will be actually "held out" to bottleneck shippers,[11] the Board will be

---

[11]Historically, a shipper could not challenge a rate unless the carrier held out service at that rate. See Routing Restrictions, 296 I.C.C. at 774-75 (stating that shippers cannot force carriers to ship over shorter rail segments than they wish unless carriers hold out such service to the public). If a carrier denied holding out service for a given rail segment, however, a shipper could show that the carrier implicitly held out service. Shippers did this by showing either that the carrier was required to provide such service under its common carrier obligations, or by demonstrating an "established interchange" for such service with another carrier. See id. at 774.

required to review the bottleneck rate for reasonableness.  See Bottleneck I, at *12-*14 (refusing to review class rates over the bottlenecks in these cases because the carriers did not hold out such rates for bulk coal shipments).  For an example of the Board's willingness to review bottleneck rates that are held out to shippers, see Burlington Northern Railroad Company v. Surface Transportation Board, 114 F.3d 206, 215 (D.C. Cir. 1997) (West Texas II) (engaging in reasonableness review of a bottleneck rate, and finding a rate of $19.36 per ton for coal unreasonable).

Indeed, as soon as a bottleneck shipper obtains a contract for non-bottleneck carriage, bottleneck carriers would have no incentive to refuse to provide a local rate for bottleneck service.  The Board's regulations clearly allow bottleneck carriers to charge up to SAC for bottleneck service, and carriers would not attempt to charge more than SAC because they would immediately be subject to rate reasonableness review by the Board.  See Western Resources, Inc. v. Surface Transp. Bd., 109 F.3d at 789-90 (noting that bottleneck carriers will likely negotiate reasonable rates with bottleneck shippers to avoid Board review of bottleneck rates).

Second, if the utilities can adequately demonstrate an absence of effective competition[12] over the entire origin-to-destination route, they may challenge the

---

[12]Under the Act, effective competition exists if the complaining shipper cannot establish the existence of market dominance under the criteria set forth in 49 U.S.C. § 10709(d) (now 10707(d)).  Under that provision, a carrier has market dominance if its revenue to variable cost percentage for the rail segment in question is greater than 180 percent.  See 10709(d)(2); Midtec, 857 F.2d at 1504.  If the shipper can make this showing, the carrier must respond by demonstrating adequate "competitive alternatives" that provide effective competition.  See Metropolitan Edison Co. v. Conrail, 5 I.C.C.2d 385, 410-16 (1989) (discussing and dismissing carriers' argument that intermodal, geographic, and product competition prevented it from having market dominance).

There is substantial evidence that bottleneck carriers possess market dominance.  See, e.g., West Texas II, 114 F.3d at 211 (summarily affirming the

origin-to-destination rate provided by the carrier. See Bottleneck I, at \*38-\*39 (noting that PP&L properly challenged the joint and proportional rates that Conrail negotiated with CSX and NS); Bottleneck II, at \*9 (same). Although this would not allow the utilities to take advantage of the competition over the non-bottleneck segments, it would ensure that carriers will exploit bottleneck segments only to the extent needed to achieve revenue adequacy. For the Board's rate review authority was meant to ensure that "'rail rate flexibility would not result in [captive] shippers bearing a disproportionate share of responsibility for the needed improvements in the railroads' financial position.'" Midtec, 857 F.2d at 1506 (quoting Arkansas Power & Light Co. v. ICC, 725 F.2d 716, 719 (D.C. Cir. 1984)). See also Coal Rate Guidelines, 1 I.C.C.2d at 523-24 (stating that a bottleneck shipper must not be forced to "subsidize long-term excess capacity" and pay for "facilities or services from which it derives no benefit").

Third, the utilities could request relief under the competitive access rules, 49 C.F.R. § 1144.5 (1997), over the entire origin-to-destination route. See Bottleneck I, at \*20-\*26; Bottleneck II, at \*6. To invoke these rules, the utilities would be required to show that the carrier engaged in "anticompetitive" conduct. See

---

Board's holding that there was an absence of effective competition over a bottleneck). Conrail was found to be market dominant over its bottleneck in a proceeding by PP&L nearly fifteen years ago. See Pennsylvania Power & Light Co. v. Consolidated Rail Corp., No. 38186S (ALJ July 24, 1984). Numerous scholars have declared that consistent price discrimination is a strong indication that there is no effective competition in the market reaping higher returns, in this case, the bottleneck segments. See Coal Exporters, 745 F.2d at 91 (citing 2 P. Areeda & D. Turner, Antitrust Law 342; R. Bork, The Antitrust Paradox 395 (1978); R. Posner, Antitrust Law 63 (1976); and L. Sullivan, Handbook of the Law of Antitrust 89 (1977)). Indeed, the Board appeared to acknowledge that the bottleneck segments lack effective competition when it stated that its task in these cases was to ascertain the extent to which bottleneck carriers may "exert their market power . . . ." Bottleneck I, at \*3.

Bottleneck I, at \*26; Midtec, 857 F.2d at 1507; 49 C.F.R. § 1144.5(a)(1). Potential relief under the competitive access rules would include ordering the bottleneck carrier to enter into a switching arrangement with another carrier or prescribing a new through route over the bottleneck. 49 C.F.R. § 1144.5(a). Admittedly, invoking these rules has proved difficult for shippers, but the Board has indicated an intent to enforce the rules to their fullest extent in the future. See Bottleneck I, at \*22, \*26.

The utilities rely on San Antonio v. Burlington Northern, 355 I.C.C. 405 (1976), aff'd sub nom. Burlington Northern, Inc. v. United States, 555 F.2d 637 (8th Cir. 1977), for the argument that they should be allowed to challenge class rates for the bottleneck segments. In that case, however, a utility brought an action to the Commission requesting rate prescription over a complete origin-to-destination shipment. See 555 F.2d at 639. Like the D.C. Circuit's recent decision in West Texas II, 114 F.3d 206 (1997), San Antonio simply demonstrates that the Act allows shippers to challenge origin-to-destination rates, regardless of how carriers choose to provide such service. In the present cases, the shippers did not challenge complete origin-to-destination rates, but challenged class rates over a segment of the route as an indirect means of preventing the carriers from exploiting bottleneck profits. That "creative rate reduction strategy" undermined the national railroad policy of deferring to carrier discretion in setting routes and rates.

Nothing in the Act explicitly requires carriers to provide separate local rates for bottleneck service. Furthermore, requiring carriers to provide separately challengeable rates on bottlenecks would prevent them from exploiting bottlenecks and charging rates up to SAC for complete origin-to-destination service. In the Board's view, this would impede the industry's efforts to achieve revenue adequacy, which is necessary for long-term capital investment and, ultimately, for a safe and efficient rail system. The Board therefore properly reconciled the competing policies of the Act when it deferred to carrier discretion in setting routes and rates and held that carriers are not required to provide separately challengeable bottleneck rates.

The Board's dismissal of the utilities' complaints is affirmed.

## IV.

The railroads cross-appeal the Board's determination that it may assess the reasonableness of bottleneck rates as soon as the utilities obtain contract rates over the non-bottleneck segments. Under Article III of the Constitution, we may only rule on existing cases or controversies. Because none of the utilities possesses a contract rate for non-bottleneck service, none has an existing claim for bottleneck rate review on this basis. As the railroads themselves point out, the Board's ruling on the contract issue presents no live controversy for adjudication. Thus, we dismiss the cross-appeal for want of jurisdiction.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.