### UNION PACIFIC RAILROAD COMPANY, Petitioner,

v.

### SURFACE TRANSPORTATION BOARD and United States of America, Respondents.

### FMC Corp. and FMC Wyoming Corporation, Intervenors.

### No. 98–1058.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1999.

Decided Feb. 15, 2000.

---

Arvid E. Roach, II argued the cause for petitioner. With him on the briefs were James V. Dolan and Lawrence E. Wzorek. Carolyn F. Corwin, Louise A. Rinn, and Schuyler W. Livingston, Jr., entered appearances.

Richard E. Weicher, Myles L. Tobin, P. Michael Giftos, James V. Dolan, Louis P. Warchot, and Samuel M. Sipe, Jr., were on the brief for amicus curiae Association of American Railroads. David A. Stein entered an appearance.

Thomas J. Stilling, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were Henri F. Rush, General Counsel, Craig M. Keats, Associate General Counsel, Theodore K. Kalick, Attorney, Joel I. Klein, Assistant Attorney General, United States Department of Justice, and John J. Powers, III and John P. Fonte, Attorneys. Robert B. Nicholson, Attorney, and Ellen D. Hanson, Deputy General Counsel, Surface Transportation Board, entered appearances.

Edward D. Greenberg, David K. Monroe, and William F. Krebs were on the brief for intervenors.

William L. Slover, John H. LeSeur, and Andrew B. Kolesar, III were on the brief for amicus curiae Western Coal Traffic League.

Before: EDWARDS, Chief Judge, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Union Pacific Railroad Company petitions for review of a Surface Transportation Board decision compelling the carrier to establish for shipper FMC Wyoming common carriage rates that can be used in combination with contract rates FMC secured with another railroad. We deny the petition.

## I.

FMC Wyoming, Inc., transports soda ash by rail from its production facilities in Westvaco, Wyoming, to customers in the eastern and southern United States. No single rail carrier can provide origin-to-destination service for the entirety of this route. That is because Union Pacific Railroad Company is a so-called "bottleneck" carrier for the initial segment: it is the only railroad providing service directly to

and from Westvaco. Depending on the particular destination to which it wishes to ship, however, FMC has a choice of carriers it may use to complete a route. FMC had entered into contracts with Union Pacific to carry soda ash to Midwest "gateways" in East St. Louis and Chicago. Then the soda ash was transported under separate contracts on a second railroad, CSX Transportation, Inc., to FMC's customers. These contracts were to expire at the end of 1997.

During the last year that these contracts were in effect, the Surface Transportation Board issued its so-called *Bottleneck* decisions, which addressed the prerogatives of shippers who transport goods over bottleneck rail segments. *See* Docket Nos. 41242 et al., *Central Power & Light Co. v. Southern Pac. Trans. Co.*, STB Decision of December 27, 1996 (*"Bottleneck I"*), *aff'd on reh'g*, STB Decision of April 28, 1997 (*"Bottleneck II"*). It has been a venerable principle of railroad rate regulation that the reasonableness of a rate is to be assessed on a "through basis"—that is to say, a shipper may challenge only the rate of the origin-to-destination route as a whole, rather than the reasonableness of rates charged for a particular segment of the route. *See, e.g., Louisville & Nashville R. Co. v. Sloss–Sheffield Steel & Iron Co.*, 269 U.S. 217, 234, 46 S.Ct. 73, 70 L.Ed. 242 (1925). In the *Bottleneck* cases, three shippers challenged this longstanding principle. Each shipper sought to compel a bottleneck rail carrier to establish separate local rates for a bottleneck segment of a through route, which would then be subject to separate reasonableness challenges before the Board. Recognizing that the shippers' complaints raised common issues that would affect broadly the railroad industry and its customers, the Board sought public comment. The respondent bottleneck carriers, supported by the railroad industry, urged that the ship-

pers' complaints be dismissed. They argued that granting the shippers the relief sought, and allowing separate rate challenges to bottleneck rail segments, would severely damage the revenue adequacy of their industry.

The Board defines a reasonable rate as one that allows a railroad to recover the "Stand Alone Cost" (SAC) of providing for the shipper's transportation.[1] However, competition over non-bottleneck segments of rail tends to drive rates for those segments down toward marginal cost, a level often lower than average total cost given the capital-intensive nature of the railroad industry. If the Board were to permit shippers to challenge separately the reasonableness of a bottleneck segment rate, the railroads argued, the through rate would inevitably be lower than the overall cost to the carriers of providing the transportation.

The Board's decision reaffirmed its long-standing policy that a shipper ordinarily is only entitled to challenge the reasonableness of rates on a through basis, even where the route contains a bottleneck segment. *See Bottleneck I* at 11–13. But the Board created a significant exception to this principle. Where a bottleneck carrier cannot provide origin-to-destination service for an entire through route, and where a shipper secures a separate negotiated contract for the non-bottleneck segment—as opposed to a common carriage rate according to a published tariff—the shipper may separately challenge a common carriage bottleneck segment rate. *See Bottleneck I* at 13–14. The Board based this exception on its interpretation of a provision of the Staggers Rail Act of 1980, *see* 49 U.S.C. § 10709(c), which the Board concluded left it without "rate reasonableness jurisdiction" over negotiated contracts between shippers and rail carriers. *Bottleneck I* at 13. Then, on rehear-

---

1. The SAC is the rate that a hypothetical railroad would charge in order to recover the costs of constructing and operating a railroad capable of accommodating the shipper's traf-

fic. *See Coal Rate Guidelines*, 1 I.C.C.2d 520, 554 (1985); *see also Burlington Northern R. Co. v. STB*, 114 F.3d 206, 212 (D.C.Cir.1997).

ing in *Bottleneck II,* the Board clarified the implications of this "contract exception." It stated that, where a shipper entered into a contract with a non-bottleneck carrier, the Board if necessary would compel the bottleneck carrier to establish a separately challengeable rate that could be used to complete the transportation. *See Bottleneck II* at 9–10. Both the shippers and railroads petitioned for review of the *Bottleneck* decisions.

While the *Bottleneck* cases were pending before the Eighth Circuit, FMC sought to negotiate new contracts with each of its rail carriers. It did reach new contracts with CSX for the destination segment, but it was unable to forge a new agreement with Union Pacific on the rates for the bottleneck origin segment. FMC then requested that Union Pacific establish, pursuant to its statutory common carrier obligations, *see* 49 U.S.C. § 11101(a), common carriage rates for its portion of the route. Union Pacific ultimately acquiesced and established rates for the origin segment. But there was a "kicker." Those rates could be used *only* in conjunction with the common carriage rates that CSX had maintained for the destination segment— not with the FMC–CSX contract rates. FMC filed a petition before the Board protesting Union Pacific's condition, arguing that the *Bottleneck* cases obligated Union Pacific to establish rates that could be used in conjunction with FMC's contracts with CSX.

The Board agreed. *See* Finance Docket No. 33467, *FMC Wyoming Corp. v. Union Pacific R.R. Co.,* STB Decision of Dec. 12, 1997 (*"FMC Decision"*). The Board explained that Union Pacific's action was at odds with the contract policies it established in its *Bottleneck* decisions:

> In *Bottleneck I,* we ... determined that, notwithstanding prior precedent generally restricting rate reasonableness challenges to origin-to-destination rates, when the non-bottleneck segment of a through route is covered by a railroad/shipper contract, the rate covering

the bottleneck segment is separably challengeable.... As we further explained in *Bottleneck II* ... notwithstanding [Union Pacific's] reluctance to have its [proposed] rate separately challenged, once a shipper has a contract rate for transportation to or from an established interchange, the bottleneck carrier must provide a rate that permits the shipper to utilize its contract with the non-bottleneck carrier.

*FMC Decision* at 4 (internal citations omitted). The Board accordingly ordered Union Pacific to establish common carriage rates that could be used by FMC in conjunction with the FMC–CSX transportation contracts. *Id.* at 6.

Union Pacific petitioned for review. We held Union Pacific's petition in abeyance pending the Eighth Circuit's resolution of the *Bottleneck* cases. In *Mid American Energy Co. v. STB,* 169 F.3d 1099 (8th Cir.1999), the Eighth Circuit affirmed most of the Board's conclusions in the *Bottleneck* cases without reaching the merits of the so-called "contract exception" policy. It concluded that the *Bottleneck* contract exception policy was not ripe because none of the petitioning shippers had secured a contract for a non-bottleneck segment. *See id.* at 1109.

## II.

■ Although we now have before us actual negotiated contracts for the non-bottleneck portions of routes, without which the Eighth Circuit thought the controversy was not ripe, the Board maintains the bottleneck contract exception policy itself is still not ripe because it has not yet ruled on the reasonableness of any bottleneck rates. All it has done is to order Union Pacific to publish separate tariffs for the bottleneck portion of a bifurcated route which, then, can be challenged in proceedings before the Board.

Examining petitioner's argument carefully in light of the Board's ripeness challenge, we note that petitioner claims that

to be ordered to publish separate bottle-neck rates is contrary to law because the *only* purpose of publication is to permit an independent challenge to those rates' reasonableness. Petitioner claims that procedure is inconsistent with the statute and governing cases construing the statute. The Board concedes—as it must—that petitioner certainly is entitled to challenge its order directing publication. That challenge, however, would be a sterile exercise if it did not bring into play the underlying Board Policy on which the order is predicated. We think, therefore, the Board's contract exception is squarely before us. Yet the Board has a point. Petitioner devotes much of its brief to the proposition that permitting separate challenges to the reasonableness of published bottleneck rates will jeopardize the adequacy of U.S. railroad revenue—which is a statutory objective.[2] We do not see how that contention can possibly be ripe before the Board has ever decided the reasonableness of any bottleneck rates. Even if petitioner were correct in assuming that the very possibility of separate challenges to bottleneck rates would ineluctably put downward pressure on total railroad revenues—an assumption which the Board correctly noted depends upon "numerous imponderables," *Bottleneck I* at 12 n.21—we could not estimate the amount of diminished revenue, and petitioner's argument perforce depends on the scale of the financial impact. Accordingly, we have before us a ripe controversy over the legality of the contract exception to the bottleneck policy, but we must decide it without regard to petitioner's concerns about revenue adequacy. Such a claim will have to await Board rate rulings.

**2.** *See* 49 U.S.C. § 10101(3) (articulating objective of "promot[ing] a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues"); 49 U.S.C. § 10704(a)(2) (In setting ratemaking policies, "[t]he Board shall maintain and revise as necessary standards and procedures for establishing [adequate] revenue levels."). In the event that the *Bottleneck* contract exception

## III.

### A.

■ As we noted, the Board justified its exceptions–a partial departure from the long-standing principle that the reasonableness of a railroad rate is to be judged on a "through" basis–on the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895. A provision of that Act states:

A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a portion of this part.

49 U.S.C. § 10709(c)(1). The Board, in the *Bottleneck* cases, construed this provision to mean that it is "without rate reasonableness jurisdiction over the rates of any rail transportation provided by contract." *Bottleneck I*, at 13. Where one of the two segments of a route is governed by a contract rate, the Board reasoned, it could not assess the reasonableness of the rate as a whole, as to do so would "indirectly result in review of the contract rate." *Id.* Petitioner quarrels with the Board's interpretation of this section—particularly objecting to the Board's use of the term "jurisdiction." Union Pacific maintains that the statute merely bars the Board from regulating the terms of shipper-carrier contracts; it does not preclude the Board from continuing to assess the reasonableness of the entire through rate. By so doing, the Board would only be "taking the contract rate into account," not regulating its terms.

We think the statute can be read either way; it is ambiguous as to the scope of

leads to the calamitous revenue consequences that Union Pacific and *amicus* Association of American Railroads predict, it is conceivable that sufficient tension might exist between the Board's revenue-adequacy obligations and the language of section 10709(c) to require the Board to reassess its *Bottleneck* contract holdings.

the Board's authority ("authority" seems a better term than "jurisdiction" in this setting) over a contract, which is why the Board relies on *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to support its interpretation of the statute. Petitioner never places its challenge to the Board's statutory interpretation in the *Chevron* framework, but implicitly suggests that the Board's interpretation is unreasonable (even if the statute is ambiguous), because it is inconsistent with the Board's interpretation of other jurisdictional statutory provisions and court cases sustaining those interpretations. Union Pacific relies heavily on *Great Northern Railway Co. v. Sullivan*, 294 U.S. 458, 55 S.Ct. 472, 79 L.Ed. 992 (1935). In *Great Northern*, a shipper challenged the reasonableness of the rate of an American rail carrier's segment of an international through route. The Supreme Court rejected the shipper's claim; even though the ICC[3] lacked true "jurisdiction" over the Canadian segment of the through route under the Interstate Commerce Act,[4] the shipper could not separately challenge the domestic carrier's rate. *See id.* at 463, 55 S.Ct. 472; *see also Canada Packers, Ltd. v. Atchison, Topeka & Santa Fe Ry. Co.*, 385 U.S. 182, 183–84, 87 S.Ct. 359, 17 L.Ed.2d 281 (1966) ("[W]here a carrier performing transportation within the United States enters into a joint through international rate covering transportation in the United States and abroad, the Commission does have jurisdiction to determine the reasonableness of the joint through rate and to order the carrier performing the domestic service to pay reparations in the amount by which that rate is unreasonable."). Union Pacific argues that, just as the Board has authority to *take into account* an interna-

tional portion of a route over which it has no jurisdiction in determining the reasonableness of a through rate, the Board must consider a contract rate in making a through rate reasonableness determination despite its inability to regulate the contract itself under section 10709(c).

The Board has some difficulty in reconciling its construction of section 10709(c) with its application of the general jurisdictional provision at issue in *Great Northern*. It might well be thought that the Board has even less authority over the Canadian portion of a through shipment (really outside of its "jurisdiction") than it does over a domestic contract, and therefore it would be more justified for the Board to allow a shipper to protest the domestic portion of a through international rate than a bottleneck rate. But as the intervenor points out, the situations are quite different economically. The *Great Northern* holding— and the broader principle that the reasonableness of rates is to be assessed on a through basis—was based on an understanding that "[t]he shipper's only interest is that the charge shall be reasonable as a whole." *Great Northern*, 294 U.S. at 463, 55 S.Ct. 472; *see also Louisville & Nashville R. Co. v. Sloss–Sheffield Steel & Iron Co.*, 269 U.S. 217, 234, 46 S.Ct. 73, 70 L.Ed. 242 (1925). This is no longer the case. By permitting a shipper to enter into contracts that are beyond review of the Board, the Staggers Act entitles a contracting shipper to—as FMC puts it— "the benefit of its bargain." Were its position to prevail, Union Pacific would be in a position to recover for itself the "benefit" of FMC's bargain with CSX, as it could set a rate that allowed it to obtain the difference between a reasonable through rate and the FMC–CSX contract price.

To be sure, that is not a point that the Board itself made. But the Board did rely

**3.** The ICC is the predecessor agency to the STB. *See* ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803.

**4.** *See* Interstate Commerce Act of 1887, Pub.L. No. 49–104, 24 Stat. 379. The current provision providing for the Board's jurisdiction is 49 U.S.C. § 10501(a)(2) (Board's jurisdiction applies only "to transportation in the United States.").

on the recent Staggers Act as justifying its new policy and we think intervenors' explanation is implicit in the Board's admittedly terse rationale. In any event, the Board was entitled to draw the inference that Congress, in specifically addressing the contract situation, wished a different result than the old ICC had reached with respect to international transportation.

Nor is the Board's position in the *Bottleneck* cases undermined by our decision in *Ford Motor Co. v. ICC*, 714 F.2d 1157 (D.C.Cir.1983). In *Ford* a shipper challenged before the ICC a joint rate established by two railroad carriers. After the ICC issued a statement expressly encouraging settlement of rate reasonableness challenges because of an "extraordinary case load bulge," the shipper negotiated an agreement with one of the railroads giving the shipper an "allowance" which would end automatically "if the ICC ordered a reduction of the joint rate." *Id.* at 1166–67. In light of the settlement, the shipper dropped the railroad from its complaint before the ICC. The ICC granted the remaining railroad's motion to dismiss the case, concluding that it no longer had jurisdiction because the settling railroad had been a "necessary party" to the shipper's rate challenge. The Commission claimed that it was "impossible . . . to determine the reasonableness of a joint rate or market dominance in the absence of cost evidence for all participating railroads." *Id.* at 1168 (internal quotations omitted). In rejecting the ICC's claim, we expressed incredulity that the ICC could make this claim of "impossibility" in light of the international rate cases like *Great Northern,*

where "the Commission can and does determine . . . the reasonableness of a joint rate though all participants are not before the ICC as defendants." *Id.* at 1169–70.

■ As the Board correctly observes, *Ford* reasonably can be distinguished from this case. *See Bottleneck I* at 14 n.24. For one thing, our decision in *Ford* was plainly influenced by the inconsistent positions of the ICC in that case. After expressly encouraging shippers to settle their rate dispute, the ICC punished a shipper for doing precisely that. *See id.* at 1169. *Ford* also did not involve a challenge to a contract rate, but instead to a joint rate where one of the carriers subsequently entered into a side settlement with a shipper. This is a meaningful distinction, as no separate contract rate was being "reviewed" by the ICC in *Ford*. Indeed, the settlement provided that, if the joint rate were found unreasonable by the Board, the reduced joint rate—rather than the settlement—would apply. More fundamentally, although *Ford* was decided after the Staggers Act it simply did not address the language of section 10709(c) relied on by the Board in the *Bottleneck* cases.[5]

Union Pacific also argues that the *Bottleneck* contract exception is inherently inconsistent with other parts of the *Bottleneck* decisions. Union Pacific points to the Board's conclusion that where a bottleneck carrier can provide origin-to-destination service for the *entire* through route it cannot be forced to interchange with another carrier—even if the shipper has secured a

---

**5.** For quite similar reasons, Union Pacific's reliance on the ICC's decision in *Metropolitan Edison Co. v. Conrail,* 5 I.C.C.2d 385 (1989), is misplaced. In *Met Edison,* as in *Ford,* a shipper challenged a joint rate where the shipper had entered into a settlement with one of its rail carriers, not a through rate where one factor of the transportation was a contract rate from the outset. And while the ICC did make a general statement in that decision that its conclusion was not altered by the contractual provisions of the Staggers Act, *see id.* at 409 n. 32, *Met Edison* did not specifically consider the language of section 10709(c). Of course, even if we were to accept Union Pacific's characterization of this footnote in *Met Edison* as a prior interpretation of section 10709(c), the Board is entitled to change that position if it provides a reasoned explanation for doing so, *see Amax Land Co. v. Quarterman,* 181 F.3d 1356, 1365 & n. 6 (D.C.Cir.1999)—which we believe the Board did in this case. *See Bottleneck I* at 13 (explaining its interpretation of section 10709(c)); *see also id.* at 14 (distinguishing *Met Edison*).

contract for the non-bottleneck segment. *Bottleneck I* at 7–8; *Bottleneck II* at 6–7. How can this conclusion, Union Pacific asks, be reconciled with the Board's "jurisdiction-stripping" interpretation of section 10709(c)? This is an inconsistency, in our view, born not of the Board's *Bottleneck* opinion, but of the Board's separate statutory obligation to protect a bottleneck railroad's "long haul" where it can provide origin-to-destination service, *see* 49 U.S.C. § 10705(a)(2); *see also Chicago, Milwaukee, St. Paul & Pacific R. Co. v. United States,* 366 U.S. 745, 749–50, 81 S.Ct. 1630, 6 L.Ed.2d 772 (1961). The Board offers a lengthy and well-reasoned explanation of the intersection of the conflicting mandates of its contractual and long-haul provisions, *see Bottleneck II* at 6–9, and we think it resolved the tension between these mandates in a reasonable fashion.

We therefore conclude that, while the objections Union Pacific raises to the *Bottleneck* contract exception policy are well-presented, none of them is persuasive. We affirm the Board's interpretation of section 10709(c).

**B.**

■ We find little merit in Union Pacific's remaining arguments that the Board nonetheless exceeded its authority when it compelled Union Pacific to establish rates for the bottleneck segment that could be used in combination with the FMC–CSX transportation contracts. In *Bottleneck II* the Board discussed a bottleneck carrier's obligations where a shipper has entered into a separate contract with the non-bottleneck rail carrier:

> In those circumstances, the bottleneck carrier cannot insist on only providing joint-rate service and, as a result, refuse service when it is unable to make those rates; instead, its common carrier obligation requires it to provide a rate necessary to complete the transportation.

*Bottleneck II* at 10. Union Pacific responds that, unlike the hypothetical carrier discussed in *Bottleneck II*, it has indeed offered rates that "complete FMC's transportation." The Board was right to reject this claim as advancing a distinction without a difference. Just as the bottleneck carrier effectively negates a shipper-carrier contract by refusing to offer anything other than joint-rate service, Union Pacific sought to override the FMC–CSX contracts. We agree with the Board that *Bottleneck II* precludes Union Pacific from effectively "thwart[ing] the right of FMC and its destination rail carriers to make separate transportation contracts in this way." *FMC Decision* at 5.

■ Union Pacific objects that the Board's order—and the Board's policy announced in *Bottleneck II*—violates its statutory right to "rate and route initiative," *see* 49 U.S.C. § 10701(c). We do not think this provision helps Union Pacific. As the Board noted in *Bottleneck II,* these rate-setting prerogatives are shared by bottleneck and non-bottleneck carriers alike, *Bottleneck II* at 9–10. Were we to grant Union Pacific the relief it seeks, it would merely mean that CSX's rate-setting rights would be undermined, rather than Union Pacific's. Moreover, to grant Union Pacific "rate initiative" in this instance would have required the Board to override the very contract that it is without authority to review under section 10709(c). There may well be tension between these two provisions, but we think the Board properly resolved that tension in favor of solicitude for the shipper and non-bottleneck carrier's contract—particularly since the non-bottleneck carrier also shares the "rate initiative" that Union Pacific believes justifies it unilaterally to override the FMC–CSX contract.

\*  \*  \*

As our colleagues in the Eighth Circuit noted in affirming the *Bottleneck* cases' non-contract holdings, the Board is required to implement statutes that express competing and occasionally conflicting policy objectives. *See Mid American Energy Co.,* 169 F.3d at 1104–05. We think that

the Board adequately reconciled the particular statutory tensions raised by the *Bottleneck* cases; confronting the unenviable task of balancing the rail carriers' rate and route prerogatives and the shippers' contract rights, the Board produced what is, on balance, a reasonable policy. *Cf. Bottleneck II* at 14 (Morgan, Chairman, commenting) ("Rather than choosing between the[ ] two diametrically opposed positions [of the railroads and shippers]—a result which the statute did not envision—our decisions in these bottleneck cases have concluded that Congress intended that these goals be implemented in a balanced and complementary way."). We deny the petition.

*So ordered.*